**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CARLOS TORRES-LUGO**                                    **CIVIL ACTION**

**VERSUS**                                                          **NUMBER: 20-210**

**BP EXPLORATION & PRODUCTION, INC., ET AL.**            **SECTION "A" (5)**


<u>**ORDER AND REASONS**</u>


Before the Court is Plaintiff's Motion for Sanctions, based upon various alleged violations of Federal Rule of Civil Procedure 30(b)(6). (Rec. doc. 101). Defendants (referred to hereinafter as "BP") filed an opposition to the motion (rec. doc. 115) and Plaintiff filed a reply memorandum. (Rec. doc. 122). Contrary to my usual practice, I permitted BP to file a sur-reply memorandum. (Rec. doc. 127). I subsequently granted leave for Plaintiff to file a supplemental reply memorandum. (Rec. doc. 128).[1]

I held a hearing on the motion, which failed to allay my frustration or resolve the issues raised in the motion. Accordingly, I ordered additional briefing by BP. (Rec. doc. 131). As promised, I then held a second hearing. (Rec. doc. 133).

Based upon this unusually fulsome briefing and multiple hearings, the Court finds that Plaintiff's motion is well-taken for the following reasons.

---

[1] I almost never allow the filing of sur-replies. In this case, not only did I grant leave for BP to file such a pleading, I thereafter allowed Plaintiff to file yet another reply and then called for more briefing from BP, all for a fairly straightforward discovery dispute. To be clear, I understand that these issues permeate a docket of similar cases that numbers in the <u>hundreds</u>. I cannot stress enough that the parties in this single-plaintiff case ought to take these ruling to heart across the docket. As a humble Magistrate Judge, I can do no more than strongly urge these parties to behave appropriately in cases to which I am not assigned – but I am very clearly doing that here.

I.      **THE RELEVANT PROCEDURAL HISTORY**

A.   *The First Corporate Deposition and Motion to Compel*

This dispute started with Plaintiff's effort to convene a Rule 30(b)(6) deposition on a wide range of issues.  After a period of some negotiation, that deposition took place on February 27, 2022.  To say the least, there were issues.

Those issues were brought to my attention via Plaintiff's "Motion to Compel Rule 30(b)(6) Deposition of BP Defendants."  (Rec. doc. 66).  That motion was based on the idea that BP's sole designated representative was prevented by BP's counsel from testifying about certain "Areas of Inquiry" (hereinafter referred to as "Topics") as a corporate representative.

The deponent was Dave Dutton, Ph.D.  Dr. Dutton ("Dutton") is a former employee of BP and served as the Industrial Hygiene Lead for the Deepwater Horizon ("DWH") response under the Unified Command.  (Rec. doc. 115).  At the February 2022 corporate deposition, Dr. Dutton apparently testified satisfactorily to 18 of Plaintiff's 24 topics of inquiry.  The motion to compel arose from BP's position that its designee should not have to testify about the other six.  The areas of inquiry that concern the Court in this motion number only two and I will limit the analysis in this opinion to those topics.[2]  Here they are, along with BP's written responses, provided just before the deposition:

> **Area of Inquiry No. 15:**
> Knowledge of the interface between epidemiology studies and the field of toxicology concerning any and all chemicals to which BP Oil Spill response workers were actually or potentially exposed to oil or dispersants. This knowledge should include, but not be limited to, the following:
>> a) The effects of oil and dispersants and all of their chemical components on human beings and human health;

---

[2]  Others were at issue in the original motion but are not germane to the present motion.

> b) Study of the effect of all the oil and dispersants on workers performing spill response work, such as the plaintiff herein;
>
> c) The health hazards associated with or caused by people being exposed to crude and/or weathered oil; and
>
> d) The health hazards associated with or caused by people being exposed to dispersants.

(Rec. doc. 77-3 at 19).

Here was BP's written objection to that area of Inquiry:

> <u>Defendants object to this request because it is vague, ambiguous and fails to describe with reasonable particularity the subject matter on which Plaintiff seeks testimony.  Absent further clarification, Defendants cannot identify or designate a witness or witnesses to testify in response to this request.  Defendants further object to this request as overbroad, unduly burdensome, not relevant to any claim or defense in this case, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence relevant to any issue</u> that may be litigated at trial pursuant to Section VIII.G.3 of the MSA. Defendants specifically object to this request insofar as information regarding BP's "[k]nowledge of the interface between epidemiology studies and the field of toxicology" and the potential human health effects of exposure to oil and/or dispersants is not relevant to any issue that may be litigated at trial pursuant to Section VIII.G.3 of the MSA and is beyond the scope of discovery permissible under Section VIII.G.5 of the MSA.  Testimony and information regarding the interface between epidemiology and the field of toxicology and the potential human health effects of exposure to oil and/or dispersants necessarily involve complex scientific issues that will be addressed by Defendants' experts and disclosed in compliance with the Court's Case Management Order deadlines.

(*Id.*)(emphasis added).

The other relevant topic:

> **Area of Inquiry No. 16:**
> Knowledge of any epidemiological studies that BP, or anyone acting on BP's behalf, has done on its own or in conjunction with any oil company group or other oil company concerning the potential health hazards for workers that have done oil spill response clean-up work, including but not limited to, BP Oil Spill response workers.

(*Id.*).

3

And BP's response:

> Defendants object to this request because it is vague, ambiguous and fails to describe with reasonable particularity the subject matter on which Plaintiff seeks testimony.  Absent further clarification, Defendants cannot identify or designate a witness or witnesses to testify in response to this request.  Defendants further object to this request as overbroad, unduly burdensome, not relevant to any claim or defense in this case, not proportional to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence relevant to any issue that may be litigated at trial pursuant to Section VIII.G.3 of the MSA.  Defendants specifically object to this request insofar as information regarding epidemiological studies that BP "has done on its own or in conjunction with any oil company group or other oil company" is not relevant to any issue that may be litigated at trial pursuant to Section VIII.G.3 of the MSA and is beyond the scope of discovery permissible under Section VIII.G.5 of the MSA.

(*Id.*)(emphasis added).

BP claimed in brief that these were proper and appropriate objections that validated its decision not to designate a witness pursuant to the deposition notice.  For two reasons, I disagreed.

First, note the underlined passages in BP's responses.  These are commonly known as boilerplate objections and are uniformly and categorically improper.  As this Court has previously stated:

> The Federal Rules of Civil Procedure take a "demanding attitude toward objections."  8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2173 (2014).  Courts throughout the country have long interpreted the rules to prohibit general, boilerplate objections.  *See, e.g., McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485-86 (5th Cir. 1990) (simply objecting to requests as "overly broad, burdensome, oppressive and irrelevant," without showing "specifically how each [request] is not relevant or how each question is overly broad, burdensome or oppressive" is inadequate to "voice a successful objection."); *see also Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000)(in order to satisfy its burden, the objecting party must

4

> make a specific, detailed showing of how an interrogatory is
> burdensome); *St. Paul Reinsurance Co., Ltd. v. Commercial
> Financial Corp.*, 198 F.R.D. 508, 511-12 (N.D. Iowa 2000)(a mere
> statement by a party that an interrogatory is "overly broad,
> burdensome, oppressive and irrelevant" is not adequate to
> voice a successful objection); *Wurlitzer Co. (Holly Springs
> Division) v. U.S. E.E.O.C.*, 50 F.R.D. 421, 424 (N.D. Miss.
> 1970)(objections to discovery requests must be specific, and
> general objections that the information sought is irrelevant,
> immaterial, oppressive, conclusory or already in possession of
> the requesting party are insufficient).   An objection to a
> discovery request is boilerplate when it merely states the legal
> grounds for the objection without: (1) specifying how the
> discovery request is deficient and (2) specifying how the
> objecting party would be harmed if it were forced to respond to
> the request.  *St. Paul Reinsurance Co.*, 198 F.R.D. at 512.

*Chevron Midstream Pipelines LLC v. Settoon Towing*, *L.L.C.,* Civ. A. No. 13-2809,  2015 WL 269051 (E.D. La. Jan. 21, 2015).

As noted, the underlined objections are classic boilerplate.  A statement that a request is "overbroad," without explaining why it is so, is boilerplate.  A statement that a request is "unduly burdensome," without explaining why, is boilerplate.  A statement that a request is "not proportional to the needs of the case," without explaining why, is boilerplate.  And a statement that a request is "not reasonably calculated to lead to the discovery of admissible evidence" is not only boilerplate but archaic, given that the cited language was excised from the Federal Rules seven years ago.

Not only are these objections improper boilerplate, they are arguably impermissible general objections.  While they are not set forth in an old-school introductory section denominated "General Objections," they are instead simply included verbatim as objections to virtually every request in the deposition notice.

The second malady in BP's approach is that, despite its apparent objections to <u>every</u> topic in the notice, BP failed to seek any sort of protective order prior to the deposition.  It

was only when the deposition actually convened that BP's counsel made the altogether bizarre announcement on the record that BP was retroactively designating the prior, unspecified deposition testimony of its paid litigation experts as its own corporate testimony for purposes of the soon-to-be-taken Rule 30(b)(6) deposition.  (Rec. doc. 66-7).[3]  Despite this, and for reasons as yet unexplained, BP nonetheless allowed Dutton to answer questions on Topics 15 and 16 in his <u>personal</u> capacity.  (*Id.*).

Sometime after the deposition concluded, in an email to Plaintiff's counsel, BP's counsel explained that it was BP's position that "it goes far beyond the scope and purpose of a 30(b)(6) to require a corporate fact witness to render expert opinions."  (Rec. doc. 66-8).  Despite this position, BP explained to the Court in a subsequent opposition memorandum that its counsel had directed Dutton at the deposition "to answer in his personal capacity <u>if able,</u> not on behalf of the company."  (Rec. doc. 77 at 5) (emphasis added).  This disclosure was important for two reasons:  First, it undermines BP's insistence that these topics called for expert testimony in the first place.  Why, after all, should a BP witness be allowed to testify "in his personal capacity" in the expert arena, but not be so permitted as a 30(b)(6) designee?  Second, it indicates that, as of the date of the first 30(b)(6) deposition, BP's counsel didn't

---

[3]  This is not how a litigant objects to providing testimony pursuant to a properly issued Rule 30(b)(6) deposition notice.  Serving an avalanche of boilerplate objections and allowing the deposition to proceed without taking interim steps is not proper practice.  And it is not enough to "signal" a position in advance of the deposition, which is as much as BP concedes it did before the deposition started.  (Rec. doc. 115 at 2 n.3).

> What is not proper practice is to refuse to comply with the notice, put the burden on the party noticing the deposition to file a motion to compel, and then seek to justify non-compliance in opposition to the motion to compel. Put simply and clearly, absent agreement, a party who for one reason or another does not wish to comply with a notice of deposition must seek a protective order.

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 242 F.R.D. 164, 166 (D. Mass. 2007).  That is what happened in this case with this deposition, and it precipitated an unnecessary motion to compel.

even know whether Dutton was "able" to testify about the designated topics in his <u>personal</u> capacity.  This leads the Court to conclude now that, as of the first deposition, Dutton had not been prepared – by counsel at least – to testify as a 30(b)(6) designee on these topics and, at least in counsel's view, may not have been "able" to provide any meaningful testimony at all.

This will become important in the Court's analysis of the present motion.

In ruling on the motion to compel, I found that the topics at issue categorically did not require BP to designate a representative to render expert opinions, as they all sought testimony about BP's <u>knowledge</u> of certain topics (as opposed to its opinion(s) about them). These topics included dermal and biomonitoring and the decision-making processes at BP around conducting such testing during the cleanup operations.  I agreed with Plaintiff's argument that BP's suggestion that it need not designate a witness to testify on worker exposure, monitoring, and health impacts when, at the time of the spill response, BP was actually making decisions on worker exposure, monitoring, and health impacts, was absurd.

It was clear to me that, for reasons passing understanding, BP and its lawyers had decided it simply did not have to designate <u>anyone</u> to testify in these areas, despite the clear requirements of Rule 30(b)(6), and despite not seeking a protective order in advance of the deposition.  In what should have been a predictable outcome, I dismissed BP's arguments, explaining to BP's counsel that (1) the subject topics did not call for expert testimony and (2) the paid-for testimony of litigation experts cannot in any event be substituted for corporate testimony about corporate knowledge of relevant topics under 30(b)(6).  I therefore ordered another deposition to go forward and ordered BP to designate an appropriate witness to testify to topics 15, 16, 19, 20, and 22.  (Rec. doc. 87).

Notably, as it concerns the issue of dermal and bio-testing, I explicitly stated that these topics were covered by the deposition notice:

> THE COURT:  Is Mr. Falcon going to argue that BP should have done a dermal and bioassay monitoring on the front-end?  Do you anticipate that that will be one of his arguments?
>
> MR. WILMORE:  I would anticipate he did.  And we offered testimony specifically, unobjected to testimony in this corporate deposition about those very things, and Mr. Falcon cross-examined BP's experts at length on those very things.
>
> THE COURT:  Put the experts to the side.  We're talking about whether one party has the right under the federal rules to question the company under Rule 30(b)(6) about those same topics, that's what we're talking about.  And as I appreciate it, he is going to argue that BP made that decision and they shouldn't have made that decision.  And now there's evidence that the very workers that he says BP exposed to these substances without the proper monitoring were, in fact, injured, at least partially because BP did not monitor them while they were exposed to those substances.  That's what he wants to ask the company about. I think that's fair game.
>
> Rec. Doc. 134 at 17.

The second 30(b)(6) deposition went forward on May 19, 2022.  The present Motion for Sanctions quickly followed.

### B.  The Second Corporate Deposition and Motion for Sanctions

As noted, the second deposition took place May 19, 2022.  Surprisingly (to the Court at least), BP chose to designate Dutton yet again, despite its counsel apparently being unsure during the first deposition whether Dutton was even able to answer questions on these topics in his personal capacity.  (Rec. doc. 77 at 5).[4]

---

[4] In explaining that BP would only allow Dutton to answer questions on the subject topics in his personal capacity, BP's counsel stated at the beginning of the deposition: "Yeah, we're not instructing him not to answer.· To the extent that he has an idea, he can tell you."  (Rec. doc. 66-7 at 9).  This, coupled with the "if he's able" qualifier from BP's later brief, hardly fosters confidence in this individual's level of competence or preparation to respond to this Court's Order of March 30, 2022.

Following the completion of that deposition, Plaintiff filed the subject motion for sanctions. In it, he claims that Dutton was unprepared to testify as a Rule 30(b)(6) corporate designee because he failed to do the work necessary to prepare himself for that role. Plaintiff's complaints about Dutton as corporate deponent are numerous. First, Plaintiff argues that, if Dutton's testimony is correct, it establishes "the total and complete absence of record keeping by BP regarding one of the most significant decisions that BP made regarding worker safety and health during the oil spill response, *i.e.*, its decision to not do worker biomonitoring or dermal monitoring." (Rec. doc. 122). He claims that Dutton could identify no documentation (1) memorializing BP's decision to do no biological or dermal monitoring of the workers, (2) memorializing BP's analysis or its decision-making process in coming to its decision to do no biological or dermal monitoring, (3) memorializing BP's consideration or analysis of NIOSH's[5] recommendations to undertake biomonitoring and dermal monitoring of the workers, or (4) memorializing BP's toxicological analysis of the weathered crude oil to which the workers were exposed. Plaintiff suggests that the idea that there would be "no documentation of such critical decisions and information within a major corporation would seem amazing and unbelievable, but the proposition would have to be accepted as true if it were based on the testimony of a representative with the knowledge, who had done the research and preparation required of a Rule 30(b)(6) deponent." (Rec. doc. 119-1 at 2). Here, Plaintiff claims, BP and Dutton failed in their collective duty to prepare.

---

[5] NIOSH is an acronym for the National Institute of Occupational Safety and Health, which was working, along with many other agencies, on worker-safety issues associated with the cleanup, including consideration of various types of monitoring.

Plaintiff argues strenuously that evidence provided by BP – including Dutton's own emails – proves that he did not adequately prepare himself and suggests that this is part of an intentional strategy by BP.  Worse than putting forward a 30(b)(6) witness who says "I don't know" a lot, Plaintiff complains that Dutton made affirmative statements <u>as the company</u>, reinforced by a patina of authority as the proper corporate designee, that are undermined, if not contradicted, by BP's and Dutton's own documents (at least one of which wasn't produced in unredacted form until after the second deposition).

In response, calling the present motion a "trumped-up discovery dispute," BP begins with a layout of the topics that the Court ordered it to respond to, along with some fancy graphics setting out its own gloss on what the Court must have meant when it ordered it to sit for a second 30(b)(6) deposition.  (Rec. doc. 115 at 3-5).  Rather unbelievably, given the statements I made on the record at the previous hearing making it clear that issues of dermal testing and biomonitoring were "fair game" in the court-ordered second corporate deposition, BP argued that "biomonitoring" and "dermal exposure measurements" were not included in the five topics the Court ordered BP to respond to.  (*Id.* at 5).

Then, in a rather incongruent segue, BP goes on to insist that Dutton was fully prepared to testify to these topics anyway, even though they were apparently outside the scope of the deposition notice.  Dozens of footnotes, along with a 38-page declaration of Dutton himself, set out what he did to prepare for this second deposition.

But this motion and the Court's consideration of it doesn't turn on what the witness says he affirmatively considered – the resolution of this motion turns on whether the Plaintiff is right about what Dutton did <u>not</u> do.  The outcome here turns on whether Dutton, as BP's designee, did the minimum necessary to pass muster under Rule 30(b)(6).

I've determined that he did not do nearly enough.

## II.    LAW AND ANALYSIS

At the outset, it is important to recall that this is one of many hundreds of similar cases pending in this district.  One such case is *Mickles v. BP Exploration & Production, Inc.*, No. 17-3566 (E.D. La.).  In that case, I ordered BP to produce, no later than April 18, 2022, some 11,600 emails of Dutton's, which had been identified as responsive in that case by BP.  (*Id.* at rec. doc. 74).

In a March 22, 2022 hearing in that case <u>about Dutton's own emails</u>, BP's counsel represented to the Court that BP had already – by March 22, 2002 – identified 11,600 of Dutton's emails responsive to Plaintiff's discovery requests.  (*Id.* at rec. doc. 67).  I ordered those documents to be produced no later than April 18, 2022.  (*Id.* at rec. doc. 74).

This mention of the *Mickles* production is relevant because core documents upon which Plaintiff relies in support of the present motion for sanctions were produced in the *Mickles* case, some before and at least one only after Dutton appeared as the 30(b)(6) deponent for a second time in <u>this</u> case.

These documents are also important because (1) Dutton didn't review the vast majority of them prior to the second deposition and (2) some of them undermine certain aspects of Dutton's testimony <u>as BP</u>, strongly (if not dispositively) establishing that he was not suited for designation as a 30(b)(6) deponent on the subject topics.

In this vein, it is important to understand Dutton's own testimony about what he did and did not do to prepare for the second Rule 30(b)(6) deposition.  That "preparation" is adequately summed up in the following passage from that deposition.  It is lengthy, but

helpful in understanding the deficiencies in the witness's preparation.  I have underlined the more important questions and answers for emphasis.

EXAMINATION BY MR. FALCON:
Q. So since you're the one, and – and Mr. Tremmel were ones that decided not to do the biomonitoring, and what investigation and what background do you have in order for you to make the determination that BP did not have to do biomonitoring?

MR. SEILER:
Objection.

THE WITNESS:
So it wasn't -- This decision was just down to Fred and I. This was the industrial hygiene team, which included folks from other groups as well as BP. The decision was never made to go out and do biomonitoring because people felt that the conclusions wouldn't be helpful.

EXAMINATION BY MR. FALCON:
Q. People concluding doesn't help me, and it's not BP's position. Before you talk about anybody else -- Coast Guard, OSHA or anyone else, I want BP's position on, what did BP do itself, as the responsibility upon party for this spill, to as -- to make sure, to s -- to as -- assure itself that biomonitoring that had been recommended, that NIOSH said they should do, what did BP actually do to investigate and study this question?

MR. SEILER:
Objection. He's answered that repeatedly.

MR. FALCON:
No, I have not gotten BP's answers yet. He's just telling me some other people are doing that.

EXAMINATION BY MR. FALCON:
Q. What did BP do?

MR. SEILER:
Objection. Object to the characterization of his prior responses.

THE WITNESS:

BP had regular phone calls. We hi [sic] experts in -- in industrial hygiene, certified industrial hygienists in other words. We interacted with people from other organizations, including OSHA, on monitoring in general. And the kind of monitoring we were doing, the kind of monitoring, the results we were having. We're sharing that with OSHA and Coast Guard and NIOSH and other folks. And this topic of, "You need to go out and do biomonitoring never came up other than when NIOSH said they were thinking about doing it but never followed through.

EXAMINATION BY MR. FALCON:
Q.  S -- Still. So did B -- The -- Besides that, did BP do its own internal investigation with people that had expertise in biomonitoring to determine whether or not it needed to be done?

A. We brought experts to the table and had --

Q. The --

A. -- discussions about -- Let's -- Let me finish -- all forms of industrial hygiene monitoring. And we continued to add certain sampling -- procedures, and -- and at times wou [sic]-- you know, stopped other procedures. But where we did all kinds of different industrial hygiene monitoring. It's a free form. So ...

Q. Who did you -- Who did you bring to the table?

A. Well, we had daily calls with OSHA, and we had Coast Guard folks and -- Let me finish. You want to know who's at the table. I'm going to tell you.

Q. Names.

A. Coast Guard and OSHA sat at the same table. We had these calls. We had folks from each of the different incident command posts. All participating on the calls and talking about -- exactly about what kinds of monitoring need to be done.

Q. Okay. So I still need who were the people? What persons from OSHA or Coast Guard were ac – So name the people that were on these calls that BP relied upon.

A. And 12 years after the fact, I don't have a list of everybody that OSHA put out – out on the table. I remember Cindy Coe was leader of more the -- more or less of OSHA with regard to the

response. But there were -- I -- <u>There's just too many to re -- to remember, an -- And it's too much time to -- to -- has passed since I -- we've had those discussions.</u>
<u>So, I mean, we had daily discussions on scheduled phone calls, to talk about our monitoring needs and talk about the monitoring results as well.</u>

Q. <u>What documents exist to memorialize B -- BP's decision to not do dermal or bioassay monitoring</u>?

MR. SEILER:
Objection.

THE WITNESS:
<u>I'm not aware of any documents that would memorialize that.</u>
That was probably the -- That was the results of ongoing discussions that we had. We didn't necessary -- We did not record every conversation that we had.

EXAMINATION BY MR. FALCON:
Q. <u>Did you go and look for any documents that would memorialize BP's decision not to do the dermal sampling</u>?

MR. SEILER:
Objection.

THE WITNESS:
<u>I personally didn't go and – and look for that. But I know from my experience and having worked the response that we didn't do it.</u>

EXAMINATION BY MR. FALCON:
Q. All right.

A. And what I mean by that, we didn't do biomonitoring.

Q. And you didn't do dermal sampling either?

A. You've asked that question many times --

Q. Right.

A. -- and the answer is still the same, yes. We did not do dermal monitoring. We had a different program in place to prevent exposure. We basically tested the materials they would work with. We understood what the hazards were. The hazards were

generally very mild with regard to weathered oil, and we pro -- provided adequate personal protective equipment to -- to protect against any exposures that might occur.

Q. And -- <u>But you did not send E-mails or prepare a document or do anything to put into the record after this extensive discussion from NIOSH about biomonitoring?</u> You as the person responsible for determining whether BP should do it, did nothing to memorialize your decision not to do it; correct?

MR. SEILER:
Objection.

THE WITNESS:
<u>I don't recall specifically. I know that we produced all of my E-mails. You have access to those. I have not had a chance to review all of them.</u>

EXAMINATION BY MR. FALCON:
Q. <u>How many of the 11,600 E-mails did you review before your deposition today?</u>

A. <u>I didn't count. I just basically opened up files and -- and -- and somewhat randomly opened up E-mails throughout that document.</u> But I don't know how many. I didn't count.

Q. Ten?

A. It was more than ten. I don't remember.

Q. Less than a hundred?

A. I don't know. I don't know.

Q. Well, I -- I need to know. 'Cause you -- You have a duty to prepare for your deposition today, and the duty means you have to go and look at documents, you have to search for documents, and you have find people in BP that have answers if you don't have answers.
So I need to know, what did you do to fulfill your duty?

MR. SEILER:
Objection. He's answered your questions many times.

MR. FALCON:
Fine.

THE WITNESS:
Well, I have answers, and my answers are based on my own
personal experience, and I don't remin – remember si -- sitting
here today writing an E -- E-mail about not doing biomonitoring.
I know we made a decision not to do that. We didn't do it. I know
that NIOSH talked about doing it, and they decided not to do it.

EXAMINATION BY MR. FALCON:
Q. Did you look at less than a hundred E-mails?

A. I don't recall how many E-mails I looked at. Maybe it was less
than a hundred, but I realized I couldn't get through 11,000 or
so E-mails between then and now.

Q. Did you ask for more time so that you could prepare yourself
properly for today?

A. I think I prepared myself more than adequately for today.

Q. Did you talk to anybody at BP, any of these -- Let me show a
organizational chart. Well, just talk about the ones that are on
these E-mails. The BP personnel on the E-mails we've talked
about so far today, have you discussed any of these issues with
-- with any of those personnel from BP?

A. I have not contacted anybody from BP. I didn't feel I needed
to. Based on my memory and recollection of working the
response, I understand what was and wasn't done with regard
to biomonitoring.

(Rec. doc. 101-11 183-
92)(emphasis added).

To summarize this testimony, BP decided not to do biomonitoring because "people

felt that the conclusions wouldn't be helpful," but Dutton could not name any of those people.

BP "brought in" people from the Coast Guard, OSHA, NIOSH, and "other folks" to discuss

biomonitoring, they had meetings and "daily discussions on scheduled phone calls," but

Dutton could not remember a single name of any of those people, save one.  Why?  Because

there were too many names to remember and too much time has passed.  Despite there being

too many people to remember 12 years after the fact, Dutton did not go back in preparation for this deposition to look for any documents or emails memorializing BP's decision not to do dermal or biomonitoring, relying instead on his "experience and having worked the response." (Rec. doc. 101-11).

Indeed, Dutton failed even to review <u>his own</u> emails on the subject, <u>randomly</u> selecting a fraction to review, despite the fact that BP's counsel had segregated 11,600 of them as far back as March 2022. He claimed he didn't have enough time to review them before the deposition, but neither he nor his counsel requested more time. And, finally, despite not reviewing more than a handful of his own emails, he did not attempt to reach out to or speak with a single other BP employee or former employee involved in the cleanup operations, including the BP employees emailing back and forth with NIOSH about the very topic of this deposition – biomonitoring and dermal testing.

This summary pretty much covers the waterfront in terms of what Dutton did not do to prepare for the second 30(b)(6) deposition. Based on everything listed above, which notably comes from the witness's own testimony, the Court easily finds that the witness was not adequately prepared for the deposition and that sanctions are warranted. This is not quite the end of the story, however.

As noted above, Plaintiff also complains about the late production of two documents that his counsel says he should have had for use during the deposition. One is an email train included in the record as Exhibit 9 to the motion for sanctions. The email train had been previously produced, but with a section redacted. (Rec. doc. 101-10). Days after the deposition, BP produced an unredacted copy. (*Id.*). Plaintiff's counsel complains that he

should have had the unredacted language before the deposition with which to cross examine the company.

The email train begins with a July 16, 2010 email, in which Max Kiefer, NIOSH Director for its Western States Offices emails Fred Tremmel of BP advising of NIOSH's "disengagement from overseeing the exposure database analysis." (Rec. doc. 101-13). There is no reason stated for NIOSH's decision to end its involvement with the exposure database. However, Kiefer attaches to the email an exposure study proposal from the National Research Council's Division on Earth and Life Studies,[6] which is called the "NRC proposal".

Kiefer advises Tremmel that the "NRC proposal was suggested to me as an option for you to pursue statistical analysis of BP exposure data." (*Id.*). Notably, the NRC proposal states that "Study topics will include. . . . <u>Biomonitoring</u>, health surveillance, and sentinel illness reports. . . ." (*Id.* at 3) (emphasis added).

The next day, July 17, 2010, Tremmel forwards Kiefer's email to various BP personnel and contractors with a "High" Importance designation. (*Id.*). Dutton is among the recipients. The entirety of Tremmel's message to these individuals was redacted in the version originally produced to Plaintiff. (*Id.* at 2). The now unredacted version provided to counsel days after the second Dutton deposition states in relevant part, "What do we want to do with the NRC proposal? Any other thoughts about what else we might do?" (*Id.*).

This would appear to be BP asking itself what, if anything, it should do about a second scientific agency suggesting biomonitoring be undertaken.

Notwithstanding that the very existence of this email undermines Dutton's testimony that there are no documents memorializing BP's decision-making around biomonitoring,

---

[6] The National Research Council is part of the National Academy of Sciences. (Rec. doc. 101-10 at n.5).

because "we did not record every conversation that we had," (rec. doc. 101-11 at 188), it certainly should have been produced to Plaintiff prior to the deposition so that counsel could question <u>the company</u> on the response to these two queries.

The second email turns out to have been part of an 88,000-page production made by BP five weeks prior to the second Dutton deposition.  (Rec. docs. 115 at 19, 119-1 at 10). Plaintiff's counsel originally argued that it was produced late but corrected the record to indicate that they "missed" the document, apparently owing to the size of the production. (Rec. doc. 119-1 at 10).  While the timing of the production of the document is no longer an issue, its substance nonetheless sheds some light on the preparation issue.

The document in question is a July 31, 2010 BP internal email thread with the subject "Pulling the IH Monitoring Plug."[7]  (Rec. doc. 101-12).  <u>Dr. Dutton is copied on the entire thread</u>.  (*Id.*).  The monitoring that BP is considering discontinuing is its air monitoring program which, it is undisputed, was finding no worker exposure to airborne toxic chemicals.  (*Id.*).

In this email, BP's John Fink observes to a group including Dutton, "Although we are documenting zero exposures in most monitoring efforts, the monitoring itself adds value in the eyes of public perception, and zeros add value in defending potential future litigation." (*Id.*).

Plaintiff's counsel observes that, in the deposition itself, Dutton testified that, at the same time this email was circulated, the industrial hygiene team – comprised of some or all of the recipients of this email – wasn't concerning itself with litigation:  "I'm not aware of any litigation at that point in time.  These people were industrial hygienists.  They were part of

---

[7]  The Court believes "IH" stands for Industrial Hygiene.

the industrial hygiene program, and they're pa -- involved in the collection of the data...."
(Rec. doc. 101-10 (citing rec. doc. 101-11 at 91:2-13)).  This document, at the very least,
undermines that assessment.  The Court doubts Dutton would have provided such self-
serving testimony if he had been aware – by reviewing his own emails – of this discussion
about optics and litigation defense among his own industrial hygiene team.

> Rule 30(b)(6) streamlines the discovery process.  It places the
> burden of identifying responsive witnesses for a corporation on
> the corporation.  Obviously, this presents a potential for abuse
> which is not extant where the party noticing the deposition
> specifies the deponent.  When a corporation or association
> designates a person to testify on its behalf, the corporation
> appears vicariously through that agent.  If that agent is not
> knowledgeable about relevant facts, and the principal has failed
> to designate an available, knowledgeable, and readily
> identifiable witness, then the appearance is, for all practical
> purposes, no appearance at all.

*Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir.
1993).

The Court is not certain whether Dutton <u>could</u> have been a proper designee for the
subject topics because his lack of preparation makes answering that question impossible.
The Court is convinced, however, that his lack of preparation for deposition specifically
ordered by the Court disqualifies him as a Rule 30(b)(6) witness on these topics going
forward.

BP is now– and for years has been –in possession of documents that readily identify
other witnesses qualified to testify as corporate deponents on these topics.  Perhaps the
appropriate person is Dr. Richard Heron, who, according to Plaintiff, was BP's
Health/Medical Lead for the BP spill response and BP's top medical professional responsible
for Oil Spill response worker-health and safety matters. (Rec. doc. 101-10).  Documents long
in BP's possession indicate that Dr. Heron was directly involved in communicating with

20

NIOSH on its recommendations regarding biomonitoring, including a July 2, 2010, email from

Margaret Kitt of NIOSH to Heron, which reads in part:

> Hi Richard:
> I just wanted to update you on NIOSH's plan to extend response
> worker exposure characterization and quantification <u>by
> incorporating a feasibility study on biomonitoring as a part of
> the expanded HHE efforts BP has asked NIOSH to do</u>.  <u>In light of
> air sampling yielding undetectable levels of toxins, or levels far
> below established limits, we are concerned about making sure
> the dermal route of exposure is well-characterized</u>.
> Also, as we heard from the IOM workshop last week, <u>the topic of
> biomonitoring needs to be addressed</u>.  We have a group within
> our NIOSH Division of Applied Research and Technology that
> have expertise in biomonitoring.  There is also another group at
> CDC/NCEH with expertise in this area.  Both groups have been
> working with Dr. Bruce Bernard to develop a scientifically
> sound protocol to use as a path forward. In fact, NIOSH would
> like to have the IOM review this protocol and provide input.  We
> certainly will share the protocol with you once the draft is
> completed.[8]
>
>                                          (Rec.      doc.      101-
>                                          14)(emphasis added).

Or perhaps the proper designee is Dr. David Flower, listed on BP's organizational chart as an

occupational medicine doctor within BP,[9] to whom Heron forwarded Kitt's email, asking for

comments.  (*Id.*).

Whether the proper designee is Heron and/or Flower, or even someone else, it is clear

from these documents that they are more suitable designees on the topic of dermal and bio-

monitoring than Dutton, particularly when Dutton failed to look for their emails or speak to

them in preparing for his deposition.

---

[8]  This email reinforces the Court's conclusion that Dutton's failure to even attempt to speak with Heron in
advance of the second Rule 30(b)(6) deposition was inexcusable.
[9]  *See* rec. doc. 135 at 5.

In similar circumstances, the Fifth Circuit has held that when a corporate deponent such as BP is in possession of documents that clearly identify an individual as having personal knowledge of the subject of a deposition notice and fails to designate that person as the deponent, such a failure may be sanctionable. *Resolution Trust*, 985 F.2d at 197. And as to the deponent's duty to prepare its designee, the Fifth Circuit has made clear in subsequent decisions that

> the deponent "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed... as to the relevant subject matters." "[T]he duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved." The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources.

*Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (quoting *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997) and *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)). Indeed, this duty extends to preparation of issues that, "although not within the [designee's] personal knowledge, [are] within the corporate knowledge of the organization." *Id.*

When the corporate designee is not knowledgeable about relevant facts, and the deponent has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all. *Resolution Trust*, 985 F.2d at 197. The Court may treat such a failure as a failure to appear for the deposition as to the topic(s) at issue, which is sanctionable under Rule 37 of the Federal Rules. *Omega Hosp., LLC v. Cmty. Ins. Co.*, 310 F.R.D. 319, 321 (E.D. La. 2015).

BP predictably argues that the well-established obligations set forth above are "tempered by a rule of reason, [in that] Rule 30(b)(6) does not require designees to have complete knowledge of all matters about which they are questioned." (Rec. doc. 115 at 6). BP cites a plethora of cases in support of this non-controversial proposition. (*Id.* at 7 n.6). But the present situation in not one in which an overly aggressive deposition-taker complains that he or she can't get an answer to one or two specific questions from an otherwise knowledgeable and prepared witness. Rather, as detailed above, this witness was unable to knowledgably testify about the entire topic of dermal testing and biomonitoring because he relied almost entirely on his memory and undertook no meaningful efforts to further prepare himself for the deposition this Court ordered to take place.

When Dutton appeared for the first deposition, he was allowed to testify about these testing regimes in his personal capacity to the extent he was "able" to do so, according to BP's counsel. In the time between that deposition and this Court's order requiring a second deposition, Dutton did not adequately and meaningfully prepare himself as a corporate designee. His declaration lists all kinds of literature and litigation-related documents that he reviewed, but the Court views much of that as deflection.

The outcome of this motion turns on what Dutton did <u>not</u> do. First, he failed to review even his own emails – emails that the Court had to <u>order</u> BP to produce to Plaintiff's counsel. The Court is troubled by the fact that, due to the timing of the production of Dutton's emails in *Mickles*, Plaintiff's counsel was made to attempt to quickly review 11,000 of those emails when Dutton himself couldn't be troubled to do anymore than look at a "random" sampling of them. Having failed to reacquaint himself with his own emails, he sought shelter in the safe harbor of "that was a long time ago and I can't possibly remember" trope.

Second, he failed to even try to speak with individuals like Drs. Heron and Flower, despite the unavoidable fact that he and BP knew that he would be asked questions about their interactions with NIOSH.

These failures lead the Court to conclude that sanctions are appropriate under Federal Rules 30, 37 and Fifth Circuit precedent interpreting those rules.

Plaintiff prays for extraordinary relief – docket-wide sanctions that would impact BP's defenses in hundreds of cases pending in this district. For what should be obvious reasons, I cannot impose (or even recommend) such sanctions when this motion was filed in this single case.

Rather, after full consideration of the facts and events set forth above, along with the law and arguments of counsel, the Court has determined that the following sanctions are appropriate and will impose them herein.

First, Plaintiff's counsel is entitled to recover reasonable costs and fees associated with the (partially) failed second 30(b)(6) deposition in which Dutton appeared unprepared to respond to testing questions. Plaintiff's counsel will submit to the Court documentation to support an award of reasonable fees and costs for the preparation and taking of that deposition. The Court will determine what percentage of those fees and costs are recoverable.

Second, BP is ordered to present the appropriate witness or witnesses to sit for yet another 30(b)(6) deposition on Areas of Inquiry 15 and 16. That witness will not be Dr. Dutton. Rather than suggest who that person or persons should be, the Court simply directs BP and its counsel to its earlier observations about the current and former BP employees who <u>actually interacted</u> with NIOSH and other relevant agencies in determining BP's course of action vis-à-vis testing. Plaintiff's counsel shall be entitled to recover their reasonable fees and costs in taking that deposition, including travel expenses.

To the extent that Plaintiff believes further relief may be appropriate once this last attempt at a Rule 30(b)(6) deposition is completed, he is free to bring a motion seeking such relief.

New Orleans, Louisiana, this __18th__ day of _____ July _____, 2022.

_____
                MICHAEL B. NORTH
        UNITED STATES MAGISTRATE JUDGE

25